**UNITED STATES of America**

**v.**

**Sherman MARSHALL, Appellant.**

**No. 71–1801.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1972.

Decided Sept. 12, 1973.

---

5. United States v. Johnson, 155 U.S.App.D.C. 28, 475 F.2d 1297 (1973).

Joseph Onek, Washington, D. C. (appointed by this Court), for appellant.

Robert E. L. Eaton, Jr., Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, and Warren L. Miller, Asst. U. S. Attys., were on the brief, for appellee. Thomas A. Flannery, U. S. Atty., at the time the record was filed also entered an appearance for appellee.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellant was convicted on January 25, 1971, of violations of the narcotics statutes that were in effect prior to the Comprehensive Drug Abuse and Control Act of 1970—namely, 21 U.S.C. § 174; 26 U.S.C. § 4704(a); 26 U.S.C. § 4705(a). The counts related to transfers of narcotics on February 19, 1971 and March 31, 1970. Appellant was sent for evaluation of possible sentencing under the Narcotic Addict Rehabilitation Act (NARA), but the pertinent institutions recommended against NARA disposition. On March 20, 1972, he was sentenced to a mandatory five year term for the § 174 and § 4705(a) counts, and concurrently to a term of 20 months to five years on the § 4704(a) counts.

██ We have no hesitancy in affirming the conviction.[1] The claim of error in the failure of the trial judge to consider the possibility of probation has been foreclosed by Bradley v. United States, 410 U.S. 605, 93 S.Ct. 1151, 35 L. Ed.2d 528 (1973).

---

1. Appellant claims that the trial judge erred in excluding his testimony that he had an identical twin and that others could not distinguish between the two. It appears he did testify that he had an "identical twin." Also Officer Wormley testified that he was familiar with appellant's family, had seen appellant on prior occasions, knew appellant to be Sherman, and although he and his twin brother, Herman, looked alike, this police officer could distinguish them. On advice of counsel, the brother (in confinement in Maryland) refused to testify. Without ruling on technical questions, we see no substantial prejudice in terms of what appellant was able to present to the jury. If

there was more to be brought out on this the trial court was quite right in stating that testimony to rebut the officer's account, and to indicate that these two men could not be distinguished, would have to come from persons other than the defendant.

Appellant complains of prejudicial error in that the officer said that he had heard the transferer of narcotics referred to as "Sherman" on three occasions, whereas in fact the evidence only established his having heard the reference to Marshall on one occasion. The trial court instructed the jury that their recollection should control. We see no substantial prejudice.

However, the present case falls within the boundaries of our consideration of NARA sentencing in United States v. Moore, 158 U.S.App.D.C. ——, 486 F.2d 1139 (en banc, 1973). When the facility at Danbury, Connecticut, recommended against NARA disposition, the trial judge sent appellant for evaluation at the facility at Milan, Michigan, which also recommended against NARA disposition. At the sentencing hearing the trial judge said he had gone over the Milan report and had sought more information, stating:

> They said that Mr. Marshall was disposed to help other people in the program, but that he wouldn't help himself. Now, I don't know what they mean by that frankly, and I want to find out, because cooperating with the program to me means helping other people. (S. Tr. 6).

After commenting that appellant had served honorably in Vietnam, impressed the judge with his attitude, and helped other participants in the NARA program, the judge noted the need for exploring the facts underlying the adverse Milan recommendation. He said (S. Tr. 15):

> I can't see my way clear on the information that I have before me at the present time to challenge their judgment as counsel suggests. That is why my impulse this morning was to ask Mr. Howard to call Milan, Michigan and find out on the basis of what information they draw that conclusion. All of this is troubled by conclusions which are not based on underlying facts. That is why when we are called upon to try a case without a jury, we not only have to draw conclusions, but we have to find facts.

Mr. Howard, the probation officer, commented (S. Tr. 16):

> They are saying, your Honor, that while he extends a hand to other people, he won't take a strong look at himself. Now, whether they have got enough actually to base it on, I am not so sure.

However, the court was concerned with the basis for the Milan conclusion, stating (S. Tr. 17):

> I would think that you are the kind of fellow that could help them with other people less experienced and less strong willed than you are. Some how or other your expression of your own will to get out of the shackles of heroin has not impressed them or some of them.

The judge recessed the hearing in order to obtain further information. Mr. Howard telephoned Douglas Lansing, in charge of the Milan facility, and reported to the judge who said (S. Tr. 19):

> I really don't know much more about the case than I knew earlier. I regret that we are down to the point where there seems to be nothing more I can do about your case . . . .

■ In this case, as in *Moore*, appeal was noted and appellate counsel had already been appointed prior to the disposition order. (S. Tr. 19). In this case, as in *Moore*, we think the interest of justice warrants a remand to permit further trial court consideration of the NARA issue, assuming appellant continues his interest in a NARA treatment disposition. Our ruling is in furtherance, and not in derogation, of the approach manifested by the conscientious trial judge on this matter. As was pointed out in *Moore*, a remand would permit a "current assessment" concerning possibilities under Title II of NARA, 18 U.S.C. § 4251 ff—of the Surgeon General's current administration of Title II; of programs at other facilities, either operated by the Public Health Service or to which that service has access; of integrating methadone maintenance and/or transition into the program formerly dominant under NARA. Such a current reassessment of NARA possibilities is particularly appropriate for this case, where the trial judge was perplexed and even uneasy concerning the adverse NARA conclusion, and voiced a plain concern, essentially unrelieved notwithstanding his further in-

quiry, as to the adequacy of the basis underlying the administrative conclusion negating the likelihood of rehabilitation through treatment. On remand, the District Judge will not be concluded by the prior adverse NARA recommendation. See *Moore, supra,* at 1204 of 486 F.2d.

■ We turn to the issue raised by appellant as to the possibility of parole, since the District Judge may have to give this consideration in his action on remand. There is no problem of exhaustion of administrative remedies since, as is set forth in *Bradley, supra,* at footnote 5, the Board of Parole now considers persons convicted under the pre-1970 laws governing narcotics offense ineligible for parole—subject only to an exception for offenders sentenced in the Seventh and Ninth Circuits, which have outstanding rulings that such offenders are eligible for parole.[2] To guide the District Court so that on remand it may have widest possible awareness of alternatives, now and in the future, we rule that appellant is correct in contending that 26 U.S.C. § 7237(d) does not make him ineligible for parole if the five-year sentence, without NARA disposition, is retained. While this precise issue was expressly left open in *Bradley,* the analysis in the body of that opinion, considered in the context of the Comprehensive Drug Abuse and Prevention and Control Act of 1970,[3] seems to this court to establish quite clearly that the restrictions on parole in effect prior to the passage of the 1970 statute are now inoperative. The provisions of the Price-Daniel Act of 1956, P.L. 84–728, formerly codified at 26 U.S.C. § 7237(d), which prohibited parole for narcotics violations, was repealed, effective May 1, 1971, by Title III, § 1101(b)(4)(A), of the 1970 enactment. The impact of such repeal is qualified only by the savings provision, § 1103(a) of the 1970 law, which provided that "prosecutions for any violation of law prior to the [May 1, 1971] effective date . . . shall not be affected . . . or abated" by such repeal. The *Bradley* opinion's analysis makes it clear that the granting of a parole under 18 U.S.C. § 4202 occurs after prosecution is terminated,[4] and hence neither "abates" nor "affects" the already-terminated prosecution. Accordingly, there is no basis, under the language of the savings provision of § 1103(a), for claiming an exception to the extinction of the prohibition of parole.

■ The release of a parolee from the prison does not terminate his post-sentence custody. The law specifically provides that he will "remain, while on parole, in the legal custody and under the control of the Attorney General, until the expiration of the maximum term," 18 U.S.C. § 4203(a). Parole is a form of custody, Jones v. Cunningham, 371 U.S. 236, 242–243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), and this control and custody sharply distinguishes a parole from a suspension of sentence, see Jenkins v. Madigan, 211 F.2d 904, 906 (7th Cir. 1954), cert. denied, 348 U.S. 842, 75 S.Ct. 63, 99 L.Ed. 664 (1954). Under 18 U.S.C. § 4203(a) the Parole Board "has wide authority to set conditions" on the freedom of the parolee. Arciniega v. Freeman, 404 U.S. 4, 92 S.Ct. 22, 30 L.Ed.2d 126 (1971). The parolees allowed to leave prison early are subjected to conditions "to accomplish the purpose of parole," *i. e.,* "to help individuals reintegrate into society," that establish re-

2. United States v. McGarr, 461 F.2d 1 (C.A.7 1972) ; United States v. Stephens, 449 F.2d 103 (C.A.9, 1971). These rulings were not preceded by any application to the Board of Parole.

3. P.L. 91–513, 84 Stat. 1236.

4. The exact holding, that a "prosecution" includes not only the proceeding for determination of guilt but also the sentence, was accompanied with statements that "a prosecution terminates only when sentence is imposed." In footnote 6, the *Bradley* opinion flatly states :

The decision to grant parole under [18 U.S.C.] § 4202 lies with the Board of Parole, not with the District Judge, *and must be made long after* sentence has been entered and *the prosecution terminated.* (Emphasis added.)

strictions far beyond those imposed by law on citizens generally. Morrissey v. Brewer, 408 U.S. 471, 477–478, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972). The reality of the custody and control status of the parolee is not diminished by the equally important reality, recognized in *Morrissey*, that permission to be outside prison walls has such significant values that it cannot be terminated without an appropriate informal hearing.

■ The 1970 Act crystallizes the Congressional approach towards rehabilitation of narcotic addicts, which surfaced in 1966 with NARA, and had been carried forward in a number of statutes widening the rehabilitation possibilities available to all concerned—to those merely charged with crime, to those convicted and awaiting sentence, and to those already sentenced.[5] The statute marks recognition of the need for integration of law enforcement with treatment and rehabilitation programs reflecting a "strong consensus" that these are not only interrelated but can have enhancing effects on each other.[6] The broad authority of the Parole Board to set conditions to avoid relapse of former narcotic addicts, and set appropriate conditions on the parolee includes authority *e. g.*, to require adherence to such regimen and surveillance as may be appropriate in the light of rehabilitative treatment and programs available in the community and its treatment centers. These considerations of policy powerfully reinforce the conclusion provided by the text of the law and the *Bradley* opinion, that the 1970 law removes, as of the effective date of May 1, 1971, the restraint that prohibited granting of parole under 18 U.S.C. § 4202 to persons convicted and sentenced under earlier Federal laws governing narcotic violations.

Congress's action in opening the possibility of parole for narcotics offenders has been implemented and complemented by Bureau of Prisons programs for inmates with a history of serious drug abuse, who comprise nearly a third of all inmates committed to Federal institutions. The Bureau's 12 intensive institutional treatment programs include five established under Title II of NARA and seven, opened in Fiscal Year 1972, for other drug-dependent offenders. Aftercare services, originally limited to offenders committed under NARA, have been extended to all Bureau drug treatment participants. These aftercare services, taking into account the special recidivism problems of the addict, and providing continued supervision and support after his release, are available through Bureau contracts with 72 public and private mental health agencies across the nation.[7]

The conviction is affirmed. As to post-conviction disposition, the case is remanded for further consideration of post-conviction alternatives.

So ordered.

5. United States v. Moore, *supra*, at 1159, 1170–1174, 1202–1205 of 486 F.2d (opinion filed by Judge Leventhal).

6. *Id.* at p. 1186, quoting S.Rep.No.92–486, 92 Cong. 1st Sess. 5 (1971).

7. Bureau of Prisons Annual Report, 1972, pp. 14–15.